ST. LOUIS BREWING ASS'N v. HAYES et al.

(Circuit Court of Appeals, Fifth Circuit. March 19, 1901.)

No. 935.

1. REVIEW—INSTRUCTIONS—REFUSAL.

Where special instructions were offered, refused, and the refusal excepted to en bloc, no error can be predicated thereon if some of them were unquestionably bad.

2. SALES AGENT—SURETIES—DISCHARGE FROM LIABILITY.

Under a sales agent's contract he was to pay cash on receipt of a bill of lading, and to keep strict account of all goods received by and returned by him, and his sureties bound themselves to pay or cause to be paid to his principal all sums which should become due on account of shipments to him or on his order during one year, during which all payments by him were to be made promptly in the ordinary course of business. *Held*, that failure of the agent to pay cash for any shipment on the receipt of the bill of lading was a breach of contract entitling his principal to proceed against him and his sureties to enforce collection of the debt then due, and hence his sureties were entitled to call on authorized agents of his principal for information as to the state of his accounts, and if, by their misrepresentations, the sureties changed their position to their detriment, they were discharged from liability.

In Error to the Circuit Court of the United States for the Eastern District of Mississippi.

This is a suit brought to recover from the principal and sureties **on a certain** bond, which is in the words and figures following, to wit:

"The State of Texas, County of Galveston. Know all men by these presents, that we, the undersigned, George Hayes, as principal, and other subscribers hereto, Nicholaus Bohn and H. C. Kerst and George Schwoebel, as sureties, acknowledge ourselves bound to pay unto the St. Louis Brewing Association, Klaussman Brewery Branch, the sum of twenty-five hundred dollars ($2,500.00). The condition of this obligation is such that whereas, the said George Hayes has been appointed agent of said St. Louis Brewing Association, Klaussman Brewery Branch, in and for the city of Galveston, Texas, and the said St. Louis Brewing Association, Klaussman Brewery Branch, has agreed to ship beer to said Hayes, from time to time, for the period of one year, beginning on November 18th, 1893, and ending on November 18th, 1894: Now, if the said Hayes shall pay, or cause to be paid, to the said St. Louis Brewing Association, Klaussman Brewery Branch, or to its agents or officers, any and all sums of money that may be or become due to said St. Louis Brewing Association, Klaussman Brewery Branch, by said Hayes on account of such shipments of beer made to him or to his order during said time,—that is to say, from November 18th, 1893, to November 18th, 1894,—all of said payments by said Hayes to be made promptly in the ordinary course of business and within said dates last mentioned, then this obligation to be and become null and void; otherwise, to remain in full force and effect.

"Witness our hands at Galveston, Texas, this 20th day of November, 1893.
        "[Signed]                                      N. Bohn.
                                              "Geo. Schwoebel.
                                              "H. C. Kerst."

The appointment of Hayes as agent, referred to in the bond, contained, among others, a provision that the said Hayes was to pay cash on receipt of bill of lading for all beer delivered.

The record shows the following plea setting up the issue as to the release of the sureties: "And these defendants further say that the said Hayes failed in business and became insolvent on or about July, 1894; that prior thereto, in April, May, or June, 1894, these defendants, mindful of the fact that they were sureties on his bond, determined to make some inquiry into the manner in which he had been conducting business with plaintiff and of the state of the account existing between him and the plaintiff, and with such end in view, did institute an inquiry to the plaintiff, or its duly-authorized agents, to wit, one Waterman, who was then and there the agent of plaintiff, and one H. J. Panzer, who was then and there the auditor of plaintiff, and these defendants were informed by said agents of plaintiff, upon the inquiry aforesaid, that the said Hayes was in all things keeping and complying with and fulfilling the terms of his contract with the plaintiff; that thereupon these defendants, relying entirely upon the statement so made to them by plaintiff's said agents, exercised no further diligence in looking after the affairs of said Hayes and plaintiff, arising from said contract, and believed that said Hayes was in no wise indebted to the plaintiff, and rested under said belief until long after said Hayes had failed in business and became insolvent, until on, to wit, the 4th day of October, 1894, when the suit was filed against them; that plaintiff had never made any demand upon these defendants for the payment to them of the obligations of said bond, and had never in any wise notified these defendants that said Hayes was indebted to them upon said contract, or that any obligations of any kind existed upon said bond, and defendants were in entire ignorance thereof until the filing of this suit; that had it not been for the false and deceitful statements made to these defendants by plaintiff, through its agents, as aforesaid, that these defendants could and would at that time have protected themselves to the extent of said bond; that said Hayes at that time was well worth the amount of said bond, and was then a man of some credit and resources, and could have and would have protected these defendants; that by reason of the false and fraudulent statements aforesaid, and the willful misleading of these defendants by plaintiff, through its said agents, and the failure to notify these defendants of any liability under said bond prior to suit and within a reasonable time after the default of the said Hayes, which these defendants say it was the duty of the plaintiff so to do upon the first default of said Hayes,—that is to say,

upon his failure to pay for the first shipment of goods upon receipt thereof of the bill of lading,—they are discharged from all liability on said bond, and the plaintiff is and ought to be estopped from prosecuting any other and further action against them thereunder."

The bill of exceptions shows, with other evidences bearing on the same issue, the following:

"Nicholaus Bohn, one of the defendants, being duly sworn, testified in his own behalf as follows: 'I am Nicholaus Bohn, one of the defendants in this case. I signed the bond fc George Hayes as a surety on the 20th of November, '93. I know a gentleman by the name of Waterman. He was a traveling salesman, collected for the Klaussman Brewery Branch, traveling salesman, and attended to the beer business of the Klaussman Branch, and collected for the Klaussman Branch,—the Klaussman Brewery Branch of the St. Louis Brewing Association. I met Mr. Waterman in the year 1894. I made it my business to hunt him up. I went out to the beach to see Mr. Waterman in Galveston, Texas. I believe it was about April, 1894. I saw him (Mr. Waterman) at a couple of places. The first time I made it my special business to hunt him up. Then I met him in the city and asked him about it. I made it my special business to see Mr. Waterman to find out how George Hayes stood up to his contract,—how he was paying up. (Plaintiff objects to any testimony from Mr. Bohn as to any conversation which he had with Mr. Waterman or any other agent of the plaintiff in April, '94, or at any other time prior to the maturity of this contract, for this reason: the contract which Mr. Bohn, Mr. Schwoebel, and Mr. Kerst have signed expressly provides that they hold themselves liable to the plaintiff to the extent of $2,500 for any and all indebtedness which may accrue to the plaintiff, to the extent of $2,500, between the 18th day of November, 1893, and the 18th day of November, 1894, and therefore what any agent of the plaintiff may have said to Mr. Bohn as to the condition of accounts between Hayes and the plaintiff, or as to what may have transpired between the plaintiff itself and any of these parties that signed the bond, is wholly immaterial, because their liability was not fixed until the termination of this contract, when it was then to be ascertained and determined. Plaintiff makes this general objection so as not to interrupt counsel in his examination of witness, so that plaintiff can have its bill of exceptions.) Mr. Waterman was the traveling agent of the Klaussman Branch of the St. Louis Brewing Association. He attended to the sales, collected money, and attended to their business. He was sent out here. He went around collecting money for the different agencies, and settled up the accounts of the brewery with the agents, and also sold beer,— generally looked after the business. Looked after the business of the Klaussman Branch of the St. Louis Brewing Association as traveling salesman of the St. Louis Brewing Association, Klaussman Brewery Branch. Q. Now, I will ask you the same question that the gentleman objected to. You called on him, then, to find out how Hayes was paying up the company? A. Yes, sir. I called to see Mr. Waterman, and asked him how Mr. Hayes was paying the company,—how he was paying up. He told me he was one of the best agents— The Court: I will admit the evidence, subject to hearing whatever authorities may be used in the argument,—according to what opinion I may have then about it. The Witness: He said George Hayes was one of the best agents they had. He was prompt, and he was only behind about $100, and "you are all right." I said, "I wish you would notify me to that effect if anything goes wrong, or any other way." That was in April, 1894. Mr. H. J. Panzer was auditor for that company, St. Louis Brewing Association, Klaussman Branch. Q. What did he do? A. I saw him go into the office of George Hayes and look over the books. I have been in the office. His business was to go over the accounts and look at the books of agents, and settle up the accounts. I thought that was the proper party to find the particulars from. He looked over the books. I had a conversation with Mr. Panzer. He told me the same thing that Waterman did. I first saw Mr. Panzer in the beginning of June, 1894, on Twentieth and Mechanic streets in the city of Galveston. Mr. Panzer said Hayes was all right. All he was behind was $100 or $125. Waterman said only about $100, but he went up to $125. That was in June, '94, Mr. Panzer told me that Hayes was all right;

if he was behind at all, it did not exceed $100 or $125. Q. Now, Mr. Bohn, if Mr. Waterman and Mr. Panzer had told you at that time that George Hayes was $3,000 or more in debt, what action would you have taken? (Counsel for plaintiff objects to this on the ground it asks for his conclusions,—what he would have done under certain state of facts. If the evidence is admissible at all, counsel for plaintiff thinks the only proper evidence that the defendants may introduce in that connection would be that he could follow up what Mr. Bohn has stated already with reference to the condition of Mr. Hayes at that time, and let the jury draw their conclusions, and not let Mr. Bohn supply those conclusions for the jury. The ordinary practice would be to let the jury conclude from the evidence what would or could have been done, and not the witness himself. The court overruled objection. To this ruling of the court, plaintiff excepts.) A. I would have demanded in writing of the Klaussman Branch that they institute suit against George Hayes at once for their money, to make him live up to the contract. George Hayes was solvent in April and June, 1894. Q. Do you know what property he had? A. He had a good deal of beer on hand, had ice boxes on hand, two wagons and outstandings, and I believe he had a bank account also. He was conducting and running a beer business here. He paid his bills promptly. I did blacksmith work for him, and he paid his bills promptly. I considered Hayes' accounts, everything together, it would amount to from seven to ten thousand dollars. Q. Do you know when Hayes retired from business? A. I believe it was in August. I cannot say for sure, because we got notice to that effect. We never knew anything about it that Hayes was behind. It was in August, I believe, that we heard he was behind. That was the first time I ever got notice. He had quit business then. Q. What became of his business and his property? A. The brewing company took some away from here, and some, of course, he sold. What he did with it I do not know. Q. You know he got rid of it? A. Yes, sir. I do not know what became of George Hayes. He stayed here a couple of months, and then I do not know where he went. Q. He left here? A. Yes, sir.'

"Cross-examination by Mr. Davidson: 'Mr. Panzer was the auditor of the St. Louis Brewing Association. In the first place, Geo. Hayes told me the auditor was down here. I went down to the office. I saw he had the accounts, the books; looked over the books and everything; straightened out things. I could not make anything else out of it. He answered it himself. He also told me Waterman was salesman for the St. Louis Brewing Association. I saw Waterman years before. Before Hayes had the business, he always came down and looked after the business,—looked after the customers, collected money, sold beer, hunted up new customers; did that before Hayes had charge of the business. That was his business at the time I had the conversation with him, as far as I know. When these gentlemen were here in 1894, I believe in April and June, 1894, I made it my special business to go find them and see them. I did that because I was on this bond. I wanted to see how Hayes stood. I expected them to tell me the truth, too. I went to them for that purpose to ascertain the state of the account. That was because I was on this bond, and because they were shipping beer to Mr. Hayes under this contract. My present business is blacksmith and horseshoer in Galveston, since 1870. I was in that business in 1893 and 1894. I was never engaged in the beer business. Mr. Panzer told me that there was about $100, perhaps $125, due by Hayes. He said $100 to $125 was all that Hayes owed his people in June, 1894. Mr. Panzer, he worked on the books. When I went in the office, he was there. He was examining the books. Panzer was auditor. I went there to find out how George Hayes stood. I took his statement. I expected him to tell me the truth. Hayes was not there. I asked Hayes about the account once in a while. He said everything was all right. I never asked Hayes particularly how he stood. I would not rely on his statement. I thought the proper party to rely on was the St. Louis people. I relied on the St. Louis people. I asked Hayes once or twice. He only complained about the boycott. He told me the business was going along first rate. He said the company would look out for him. I know Hayes had a bank account. He gave me checks on the bank sometimes, when he paid my blacksmith bills. I got my money for it. That is the only informa-

tion I have about a bank account. Q. You testified as to his having some seven or ten thousand dollars in property. Tell the jury what that property was in, please. A. I went to the cold storage sometimes. I suppose he had one, two, or three carloads of beer there. Q. When were you in the cold storage? A. Off and on. Q. What month? A. I was in there May, June, off and on; maybe in April, also. I often had to go in there. In the first place, to see how everything stood. I was on his bond. Q. Did you take stock? A. I did not take stock. I went in there as I would in any other house. I went in the place, and looked around, and used my judgment. I looked and saw if there was beer there that belonged to George Hayes. I went in the cold storage sometimes twice a month, sometimes once a month, —any time I had business down there; in April, May, and June, 1894, and also before that. Q. Was anybody else's beer in there? A. Yes, sir; some other beer there, too; always had three carloads in there. I saw some bottled beer there. I didn't count them. I also saw some beer standing on side track unloading. I went in there to see how everything looked, or if he was well protected, and me, also. I saw he was worth $10,000. Q. How much beer did you say was there? A. I always considered two or three carloads. I also saw a lot of bottled beer there in barrels. I supposed he had paid for it. That is what Panzer and Waterman told me, because they said all beer must be paid cash for on receipt of bill of lading. Q. What is that worth a car? A. I really do not know, except from hearsay. I stated Hayes was worth seven to ten thousand dollars. I suppose a carload of beer was worth about $400. Q. That is $1,200. A. I also saw it on the track. Q. Tell us about it being on the track. A. I saw sometimes two, three, and four carloads standing on the track and unloading. Hayes had a whole lot of customers he furnished ice boxes to. I do not know what they were worth to the business. I never counted them. I did not go that far. I know Hayes had a whole lot of beer faucets. I saw them in the cold storage. Some I saw in his office when I went in there. I patronized my friend Hayes always. I saw those beer bottles, too. The beer boxes George Hayes told me belonged to him. Hayes had two wagons, I know of. I did his blacksmithing. He had one general beer wagon that belonged to him individually. The wagons and mules were worth about $275, I suppose. He had a buggy. It was brand-new. I sold it to him myself. I sold it to him for what it was worth, $150, four or five months, maybe three months, before he quit business. I could not really say what other property Hayes had. All the rest is hearsay. He was interested in some store. My information was he (Hayes) didn't owe anything. I inquired all I could in my estimation. If they told me lies, I could not help it; it was not my fault. I do not know whether or not Hayes owned a foot of ground.'

"Redirect Examination: 'Q. If Hayes owed $3,000 in April, could you have made the money out of him? A. He had plenty of property at that time, and in June, 1894, he conducted this beer business, it was a going concern, and the money could have been made out of him at those times.' "

On the issue in question, the judge charged the jury as follows: "The defendants claim to have had a conversation with one Panzer in June, 1894, in regard to the state of this account, and they have introduced the evidence of Mr. Panzer, at that time, that he was in the employ of the plaintiff, and was here for the purpose of adjusting this account,—looking after the solvency of the sureties. They have read you his evidence about what the conversation was with Nicholaus Bohn. You have heard the evidence of the other parties. Now, if you believe from the evidence that Mr. Panzer at that time was representing the plaintiff, and had the authority to adjust this particular account now in suit, the statements he may have made—if he did make any to these sureties—would come within the scope of his authority as acting for the plaintiff, and would be binding upon the plaintiff, the same as being made by the plaintiff in person, if such a thing was possible. Therefore, you are to determine whether or not he made the statement that the account was practically even, or he may have owed $100 or $125. If you find he made that statement, and it is materially false in this, that at that time Hayes was in arrears as much or more than the bond (I believe the account shows about $3,000), if you find that to be true, then you are instructed in

this manner: That statement, although false, and found to be false, would not release the sureties, unless you find from the evidence that at that time Hayes was solvent, or at least he was solvent to the extent that the sureties could have protected themselves as against liability upon this bond. If you find he was solvent to the extent they could have protected themselves to the full extent of the bond, in that event it would be a defense in this action, and you would find as against Hayes and in favor of the sureties. If, however, you believe, from the evidence, that the statement was made, and it was misleading and untrue in fact, yet if you believe from the evidence Hayes was then insolvent, and these parties could not have collected this bond then, although the statement might have been false, or was false in fact, that would not relieve the defendants. They could only be relieved in the event you find the statement to be false, and Hayes was solvent, and they could have protected themselves or could have partially protected themselves. If you find he was entirely solvent, and they could have been protected for the $2,500, then you will find for the sureties. If you find, however, he was not wholly solvent, but they could recoup for $500 or $1,000, or any such sum, it would be a partial reduction, a partial defense, but not a complete defense. Upon that issue, gentlemen, the burden of proof is upon the sureties to show by a preponderance of evidence that the statements were made by Panzer, that it was in the scope of his authority, that it was untrue in fact and they were misled to their injury; and the further fact, Hayes at that time was solvent, that they could have protected themselves to the extent of the bond, or even, if not wholly solvent, they could have protected themselves partially, it is only a partial defense,—it would be only a reduction of their liability. The limit of their liability is $2,500, with interest at six per cent. from the 1st January, 1895. Therefore, if you find Hayes was insolvent, although you believe the statement to be untrue in fact, therefore you will find a verdict in favor of the plaintiff against George Hayes for $5,167.46 with six per cent. interest from the 1st January, 1895, and find against the sureties, N. Bohn, Schwoebel, and Kerst, in the sum of $2,500, with six per cent. interest from the 1st January, 1895. If you find Hayes was solvent, and they could have made the entire bond or saved themselves entirely upon the bond, the latter part of your verdict shall be: 'We, the jury, find in favor of the sureties, N. Bohn, Schwoebel, and Kerst [giving their names], as against the plaintiff;' or, if you find that they could have recouped themselves, or saved themselves, to a certain extent, you will find the verdict in favor of the sureties for the difference between $2,500 and what they could have saved themselves, with interest from the 1st January, 1895. You are the judges of the weight of the evidence and the credibility of the witnesses. It becomes purely a question of fact for your determination."

The verdict of the jury was against the principal, Hayes, for the full amount claimed, but in favor of the sureties on the bond, releasing them from all liability.

Geo. E. Mann, for plaintiff in error.

John Lovejoy, A. Sampson, and M. L. Malevinski, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After stating the case as above, PARDEE, Circuit Judge, delivered the opinion of the court.

This is the third appearance of this case in this court. On the first writ of error the question presented was whether an arrangement between the brewing association and the principal on the bond by which the brewing association was to furnish beer on credit, operated to release the sureties from liability on the bond, and this court held that such outside arrangement did not operate an entire release of the sureties. See Association v. Hayes, 17 C. C. A. 634, 71 Fed. 110. On the second writ of error, the questions passed upon were whether the

failure of the principal, Hayes, to sign the bond under the circum·
stances shown in the evidence, operated to relieve the sureties from
liability thereon, and whether the delivery of the bond sued on, which
was denied by the pleadings, was necessary to be proved by direct evi-
dence. See Association v. Hayes, 38 C. C. A. 449, 97 Fed. 859. On
the third trial the defense relied upon was that the sureties were re-
leased because, while the contract required that Hayes, the principal,
should pay for the beer upon receipt of the bills of lading, the brew-
ing association had given him large and extensive credit, and upon
the application of the sureties to the brewing association and its
agents for the information as to Hayes' accounts the sureties had
been misled and deceived by representations that said Hayes was in
all things keeping and complying with and fulfilling the terms of his
contract, when in fact he was then indebted for more than the
amount of the bond, whereby the sureties were lulled into security
and lost all opportunity to protect themselves, the said Hayes being
at the time possessed of sufficient means and property to have fully
paid off his liabilities. On this last presentation, counsel for plain-
tiff in error presents some twelve assignments of error, the first four
of which are altogether too general to demand attention, and the last
seven are based upon the refusal of the court below to give some
eight special instructions, offered, refused, and excepted to en bloc,
some of which are unquestionably bad, and therefore the whole offer-
ing was properly refused. Without further criticism of the assign-
ments of error, we notice that while they challenge the rulings of the
court on admissions of evidence, object to the general charge of the
court, and challenge the rulings refusing the special charges asked,
they practically present one question only,—that is, whether the sure-
ties were released from their obligations on the bond by reason of
misrepresentations made by the agents of the association to the sure-
ties in regard to the state of the accounts between Hayes, the prin-
cipal on the bond, and the association. The major proposition sub-
mitted by counsel for plaintiff in error, on which the whole case
hangs, is as follows:

"The liability of the sureties did not and could not accrue until the year
ended on October 18, 1894, or Hayes finally stopped buying beer under the
contract for year ending November 18, 1894, and it was irrelevant and mis-
leading to the jury to allow evidence as to what the traveling auditor said
Hayes owed in April or June, or evidence as to what property Hayes owned
in April or June, 1894."

On the last hearing in this court it was held that the contract
of appointment of Hayes and the bond given in pursuance thereof
were parts of the same transaction, and must be construed together
as one instrument. See Association v. Hayes, 38 C. C. A. 449,
97 Fed. 859. This being the case, if we turn to the contract of
appointment, we find that Hayes was to pay cash on receipt of
bill of lading, and to keep strict account of all packages, kegs,
or half barrels received, as well as empties returned; and by
reference to the bond we see that the sureties bond themselves
that Hayes should pay or cause to be paid to the association any
and all sums of money that may be or become due to said association

by said Hayes on account of shipments of beer made to him or his order from November 18, 1893, to November 18, 1894, all such payments to be made promptly in the ordinary course of business. Under this contract the failure on the part of Hayes to pay cash for each shipment upon receipt of the bill of lading was a breach of the contract, and gave the association the right to immediately proceed by suit against Hayes and his sureties to enforce the collection of its debt then due; and it seems to be idle to contend that under the contract between the parties Hayes could buy beer for a whole year, neglect to pay, embezzle, or otherwise waste the proceeds, and, during the whole year, the association and the sureties should stand idly by, unable to protect themselves. The association had the right to demand payment for each consignment as soon as it was received by Hayes, and, in case, with the consent and nonaction of the association, Hayes was neglecting to pay, and yet receiving large consignments of goods, the sureties would have a right to protect themselves; and, if the sureties had a right to protect themselves whenever Hayes' conduct became such as to imperil their interests, then we think it is clear that if, by misrepresentations on the part of the association, the sureties were lulled into security, and thereby their condition made worse than it would have been if they had been truthfully informed as to the facts, they would thereby be discharged.

As to the matter of the state of Hayes' account, the inquiries made by the sureties, the representations made by the association and its agents, the authority of the agents to speak for the association, and whether or not the sureties' condition was worse in June than in October, when suit was finally instituted, are questions all raised by the pleadings, and, under evidence tending to establish the same, were, in a fair, lucid charge by the court, submitted to the jury. It may be that, if the case were now before us upon the same facts, we would find a different verdict, but as the record stands we find no reversible error in the proceedings of the circuit court, and its judgment is affirmed.